UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **Trinity Bible Church of Dallas,**<br><br>                    Plaintiff,<br><br>          v.<br><br>**City of Dallas,**<br><br>                    Defendant. | Civil Action No. 3:26-cv-02589 |

## ORIGINAL COMPLAINT OF PLAINTIFF
## TRINITY BIBLE CHURCH OF DALLAS

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................3

PARTIES .............................................................................................................................4

JURISDICTION AND VENUE ............................................................................................4

LEGAL AND FACTUAL BACKGROUND.........................................................................4

    A.   Church-led education is a core religious exercise protected by the First Amendment.........4

    B.   Trinity Bible Church plans to use its Property for religious education. ...............................6

    C.   The Dallas Development Code authorizes the Church to use its Property for "religious training" and "religious activities" as a matter of right, but the City construed the Code to prohibit religious education without an SUP....................................8

    D.   The City's SUP requirement conditions the Church's religious exercise on unlimited and individualized legislative discretion. ..............................................................9

    E.   The City does not require an SUP for numerous comparable nonreligious land uses, including public schools, child-care facilities, libraries, and country clubs...........................11

CAUSES OF ACTION.........................................................................................................12

COUNT I  Violation of the Equal Terms Provision of RLUIPA
(42 U.S.C. §2000cc(b)(1))...............................................................................................12

COUNT II  Violation of the Substantial Burden Provision of RLUIPA
(42 U.S.C. §2000cc(a)(1)) ...............................................................................................16

COUNT III  Violation of the Unreasonable Limitations Provision of RLUIPA
(42 U.S.C. §2000cc(b)(3)(B)) ..........................................................................................18

COUNT IV  Violation of the Free Exercise Clause of the First Amendment
(U.S. CONST. amend. I; 42 U.S.C. §1983) ..........................................................................19

COUNT V  Violation of the Establishment Clause of the First Amendment
(U.S. CONST. amend. I; 42 U.S.C. §1983) ..........................................................................23

COUNT VI  Violation of the Texas Religious Services Clause
(TEX. CONST. art. I, §6-a)................................................................................................25

PRAYER FOR RELIEF .....................................................................................................26

JURY DEMAND ................................................................................................................27

Plaintiff Trinity Bible Church of Dallas (the "Church") files this Original Complaint against Defendant City of Dallas, Texas (the "City") and alleges as follows:

## INTRODUCTION

Trinity Bible Church wants to do what American churches have done since before the First Amendment was ratified: educate children in all subjects through the lens of biblical truth. The City of Dallas says it cannot—not, at least, without subjecting the Church's core religious exercise to discretionary legislative approval through a "Specific Use Permit" ("SUP") that can be denied, conditioned, or revoked at any time and for any reason.

The Dallas Development Code ("DDC") expressly authorizes a "Church" like Trinity to use its property by "right" for purposes of "public worship, religious training, or other religious activities." But once Trinity invoked that right to use its property for full-time religious *education*, the City relabeled the Church a "private school" requiring SUP approval from City Council—a legislative process of individualized scrutiny, subjective criteria, neighbor vetoes, and a perpetual threat of revocation. Comparable secular institutions within the same zoning district, meanwhile, face no such regulatory burden: public schools, child-care facilities, country clubs, libraries, museums, parks, and playgrounds are free to operate in the same zoning district "by right"—despite their similar or greater impact on traffic, parking, and noise. And because religious schools are constitutionally excluded from the government-run "public" school category, the City's favored treatment of that category guarantees all religious schools are treated worse than their secular counterparts.

The Church does not seek special treatment or an exemption from all zoning regulation. It seeks equal treatment under objective, nondiscretionary standards that govern comparable secular institutions and protect its pre-political rights to religious freedom. The Development Code's SUP requirement, on its face and as applied to the Church, violates RLUIPA, the First Amendment, and the Texas Constitution. The Church brings this action for declaratory and injunctive relief, damages, and attorneys' fees.

## PARTIES

1. Plaintiff Trinity Bible Church of Dallas is a Texas nonprofit corporation with its principal place of business in Dallas, Texas. The Church owns real property at 6700 Lyndon B. Johnson Freeway, Dallas, Texas 75240 (the "Property").

2. Defendant City of Dallas is a municipality and political subdivision of the State of Texas, located in Dallas County.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1343 (civil rights). The Church asserts federal claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc *et seq.*, and the First and Fourteenth Amendments to the United States Constitution.

4. The Court has supplemental jurisdiction over the Church's state-law claim under 28 U.S.C. §1367.

5. Venue is proper under 28 U.S.C. §1391(b) because the Church's Property is in Dallas County, within the Northern District of Texas, Dallas Division, and all events giving rise to this action occurred there.

## LEGAL AND FACTUAL BACKGROUND

**A. Church-led education is a core religious exercise protected by the First Amendment.**

6. "Religious education is vital to many faiths practiced in the United States." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020). For Bible-believing Christians, all human learning must be grounded in Scripture, because "[a]ll Scripture is breathed out by God and profitable for teaching, for reproof, for correction, and for training in righteousness, that the man of God may be complete, equipped for every good work." 2 TIMOTHY 3:16-17. The Bible instructs Christian families to "bring [children] up in the discipline and instruction of the Lord," EPHESIANS 6:4, and "teach them diligently." DEUTERONOMY 6:7. Accordingly, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady*, 140 S. Ct. at 2064.

7.    For centuries, American churches have established and operated private religious schools. "Most of the oldest educational institutions in this country were originally established by or affiliated with churches." *Id.* at 2065. "Protestant churches," in particular, have "viewed education as a religious obligation" since "the earliest settlements in this country." *Id.* This was a "core belief of the Puritans," *id.*, who "initiated American education" by "founding Harvard College … and after Harvard other schools and colleges all over New England." WILLIAM HALLER, THE PURITAN BACKGROUND OF THE FIRST AMENDMENT, *in* READ ed., THE CONSTITUTION RECONSIDERED (1938), 140. Early church-led schools in America taught not only theology but all subjects of traditional Western liberal arts—"the Bible and the classics, rhetoric, oratory and forensic logic, mathematics, and moral and natural philosophy." *Id.*

8.    It was against this backdrop that the First Amendment was adopted to protect religious "exercise"—a term the Framers chose over "conscience" precisely to "'extend[] the broader freedom of action to all believers.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2276 (2020) (Gorsuch, J., concurring). This constitutional guarantee was originally understood to protect the "free exercise" of religion as a "prepolitical right"—as opposed to its mere "toleration" as "an act of legislative grace." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1443-44 (1990). The First Amendment's accompanying prohibition of "establishment of religion" was understood to prevent "instrument[s] for state control over religion." *Id.* at 1438-39. "The very purpose" of enumerating religious protections in "a Bill of Rights was to withdraw [these] subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Va. State Bd. of Educ. v. Barnette*, 63 S. Ct. 1178, 1186 (1943). Accordingly, such "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections." *Id.* at 1186-87.

9.    The Establishment Clause prohibits government entities, including public schools, from "compell[ing] attendance and participation in a religious exercise." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (2022) (cleaned up); *see also Abington Sch. Dist. v. Schempp*, 83 S. Ct. 1560, 1572-74 (1963) (public schools cannot require "readings, without comment, from the Bible"). But

private "Christian schools have proliferated with the aim of inculcating Biblical values in their students" and "expressly set themselves apart from public schools that they believe do not reflect their values." *Our Lady*, 140 S. Ct. at 2065. Over 75% of American private schools are religiously affiliated. Katherine Schaeffer, *U.S. public, private and charter schools in 5 charts*, PEW RESEARCH CENTER ( June 6, 2024), perma.cc/NB6T-4B2G.

**B.   Trinity Bible Church plans to use its Property for religious education.**

10.   Trinity Bible Church is a Protestant Christian congregation founded in 2018 for the stated purpose of "presenting the Gospel of Jesus Christ and related religious charitable *and educational* activities." The Church's "Vision & Mission" provides that "[t]he Bible is the inspired, inerrant, infallible Word of God, authoritative for faith, and completely sufficient for life and godliness in the Person of Christ Jesus."

11.   Consistent with longstanding Protestant Christian tradition in America, the Church views the education of children in all subjects through the lens of biblical truth as a core religious activity and integral part of its religious mission. To fulfill that mission, the Church plans to use a portion of its Property to provide full-time religious education.

12.   The Church's planned school will operate as an extension of the Church: it will share doctrinal commitments, require participation in religious observance integrated throughout school curriculum (including prayer, biblical instruction, and Scripture memorization), limit faculty employment and family enrollment to persons who agree with and adhere to a statement of faith, and remain subject to governance involving Church leadership.

13.   Within this explicitly religious framework, the school will serve as the primary source of educational training for students during the regular school year on normal hours Monday through Friday. It plans to initially serve pre-kindergarten through eighth grade, with later potential expansion to high school. It also plans to obtain accreditation from a recognized accrediting agency.

14.   In 2024, the Church acquired the Property at 6700 Lyndon B. Johnson Freeway, Dallas, Texas 75240, to support its expanding congregation and operations, including its planned religious

school. The Property's size, layout, and configuration—including three large facilities with ample

parking garage and lot space—make it particularly suitable for the Church's combined worship and

educational activities:






15.   The Church has begun planning and preparation for the buildout of its religious school at

the Property. It has met with potential donors and staff members for the school, and continues to

incur mortgage payments, carrying costs, and other ongoing expenses associated with holding and

developing the Property. However, the Church is unable to further crystalize its plans and develop

the Property for school-related purposes in light of the City's determination that the Church cannot

operate a religious school without a discretionary permit from City Council.

**C.    The Dallas Development Code authorizes the Church to use its Property for "religious training" and "religious activities" as a matter of right, but the City construed the Code to prohibit religious education without an SUP.**

16.    The Church's Property is zoned Neighborhood Office, or "NO(A)." DDC §51A-2.102(88), (98).

17.    Within the NO(A) zone, the Development Code permits property to be used as a "Church" "[b]y right." DDC §51A-4.204(4)(B). It broadly defines "Church" to include any "facility principally used for people to gather together for public worship, religious training, or other religious activities." *Id.* §51A-4.204(4)(A). Courts have construed similar language to encompass religious education. *SWZ, Inc. v. Bd. of Adjustment of City of Fort Worth*, 985 S.W.2d 268, 270-71 (Tex. App. 1999) (church-affiliated "religious education classes" fell within "church" under Fort Worth zoning ordinance); *City of Concord v. New Testament Baptist Church*, 382 A.2d 377, 380 (N.H. 1978) (church-run private school was a "permitted use connected with … [the] Church" as "an integral and inseparable part of a church").

18.    The ability of a "Church" to operate "by right" does not exempt it from zoning regulations. All land uses within the NO(A) zone are subject to a comprehensive body of generally applicable, objective zoning requirements, including minimum setbacks, floor area ratio limitations, lot coverage maximums, environmental performance standards, and landscape regulations. DDC §§51A-4.121(a)(4)-(8), Arts. VI, X. "Church" use also requires compliance with objective off-street parking standards calculated based on fixed seating capacity, as well as building permit and certificate of occupancy requirements. *Id.* §51A-4.204(4)(C). Trinity Bible Church does not challenge any of these objective, non-discretionary regulations, and its planned religious school would remain subject to all of them.

19.    On December 3, 2025, the Church requested confirmation from the City's Planning & Development Department "that it may use its [P]roperty for a Church inclusive of private religious education which is core to its religious expression, as a matter of right." The Church also submitted a detailed legal memorandum explaining that "[t]he plain text of [the Development Code], Texas court decisions interpreting similar language, and longstanding American religious traditions all confirm

8

that church-affiliated religious education falls squarely within [the Code's] definition [of 'Church' use]," and that "an alternative interpretation that forces the Church to obtain a Specific Use Permit [] for religious education, while permitting comparable secular education as of right, would run afoul of federal and state religious-liberty protections." The Church expressly characterized the planned school as a religious activity of the Church, conducted under the Church's authority and as part of its religious mission.

20. In response, the City inquired into four details regarding the Church's planned school: (1) whether it would "be the primary source of educational training for students"; (2) its "hours/days of attendance"; (3) its "ages and grades"; and (4) whether it would be "certified by an accrediting agency." The Church responded that: (1) the planned school would be the primary source of educational training for students; (2) the hours and days of attendance for students would generally be 8:00 AM to 3:30 PM on Monday through Friday during the normal school year with no classes during summer break; (3) the grades for the school would be pre-Kindergarten to Eighth grade initially with the potential for adding high school later; and (4) the school would be certified by an accrediting agency.

21. The City's January 2026 response acknowledged that "a church use is allowed by right in this zoning district," but nonetheless concluded that the Church's planned religious school is not "a church use." Instead, the City determined that, "[b]ased on the information provided," the Church's planned use is "classified as a *private school* which requires a specific use permit."

### D. The City's SUP requirement conditions the Church's religious exercise on unlimited and individualized legislative discretion.

22. An SUP in Dallas is not a routine permitting process. It is a legislative act: each SUP must be individually "granted by the city council by separate ordinance." DDC §51A-4.219(a)(2). Applicants must "comply with the zoning amendment procedure for a change in zoning district classification." *Id.* §51A-4.219(b)(1). Yet such compliance guarantees nothing: "[t]he SUP requirement for a use in a district does not constitute an authorization or an assurance that the use will be permitted." *Id.* §51A-4.219(a)(2). Instead, "[e]ach SUP application must be evaluated as to its

9

probable effect on the adjacent property and the community welfare and may be approved or denied as the findings indicate appropriate." *Id*. If the SUP application is denied, "no subsequent applications may be considered for that property for two years." *Id*. §51A-4.701(d)(1).

23.   An SUP application alone requires a mandatory fee, detailed site plan, traffic impact analysis ("if the director determines that the analysis is necessary"), and "any other information the director determines necessary for a complete review." *Id*. §51A-4.219(b)(2). The process of getting an application to City Council "take[s] eight or nine months," April Towery, *Dallas, We Have a Plan: Zoning Could Get Easier And Faster, Says Director of Planning and Urban Design*, CandysDirt (Aug. 31, 2022), perma.cc/BAL9-DSE9, requires approximately one year to complete, and would cost the Church over $100,000 in application fees, professional studies, and legal expenses.

24.   Once submitted, an SUP application must proceed through a public hearing before the city plan commission, followed by a separate public hearing before the full City Council. DDC §51A-4.701(b)-(c). Surrounding neighbors also receive written notice and are given an opportunity to appear in opposition to the SUP application. *Id*. §51A-4.701(b)(5).

25.   If the plan commission recommends denial of the SUP application—or if neighbors owning at least 20% of land within 200 feet object—approval of the SUP requires a three-fourths supermajority of the entire City Council. *Id*. §51A-4.701(c)(3)(A)-(B). A small group of neighboring landowners who object to the Church's religious education can thus effectively exercise veto power over its core religious exercise.

26.   Once an SUP application reaches City Council, the proposed land use is subjected to unfettered individualized scrutiny under subjective standards. The Council "shall not grant an SUP for a use except upon a finding that the use will: (A) complement or be compatible with the surrounding uses and community facilities; (B) contribute to, enhance, or promote the welfare of the area of request and adjacent properties; [and] (C) not be detrimental to the public health, safety, or general welfare." DDC §51A-4.219(a)(3). The Council also has discretion to "impose reasonable conditions" on SUP approval or "require the property owner to participate in cost-sharing for infrastructure improvements." *Id*. §51A-4.219(a)(5), (b)(7).

10

**27.   SUP approval thus depends on whether elected officials subjectively believe the proposed land use—here, the Church's religious exercise—"complement[s] or [is] compatible with the surrounding uses," "contribute[s] to, enhance[s], or promote[s] the welfare of the area," is "not [] detrimental to the public health, safety, or general welfare," and complies with any other "conditions" it deems necessary to "impose."**

28.   Even if an SUP application is granted, it is temporary. The City Council retains "the ability … to supplement, remove, or amend any of the conditions or other provisions in an SUP ordinance" at any time. *Id*. §51A-4.219(c)(13). The Council may also impose a "time limit" that "automatically terminates" the SUP upon its expiration and require the applicant to re-apply for its "renewal"—by going through the entire process again. *Id*. §51A-4.219(b)(6).

> **E.   The City does not require an SUP for numerous comparable nonreligious land uses, including public schools, child-care facilities, libraries, and country clubs.**

29.   Unlike a land use requiring an SUP, a land use permitted "by right" in the same NO(A) zone requires no legislative act, no City Council scrutiny, no subjective standards, no public hearing, no neighbor objection opportunity, no supermajority vote, and no time-limited permission subject to perpetual future revocation and renewal.

30.   Numerous nonreligious uses are permitted by right in the Church's NO(A) zone, including a "child or adult care facility," DDC §51A-4.204(3); a "library, art gallery, or museum," *id*. §51A-4.204(16); a "country club with private membership," *id*. §51A-4.208(1); and a "public park, playground, or golf course," *id*. §51A-4.208(3).

31.   A "public school" is also permitted by right in the Church's NO(A) zone, subject only to Residential Adjacency Review ("RAR"). *Id*. §§51A-4.204(17)(B), -4.803(e).

32.   The RAR requirement for public schools categorically differs from the Church's SUP requirement. The decision-maker for a RAR is not the City Council, but the director of development services who must decide the RAR within 30 calendar days or it is automatically approved. *Id*. §51A-4.803(e)(2)-(3). The criteria for RAR approval are objective and limited to enumerated, site-specific grounds such as vehicular circulation hazards and residential-adjacency impacts like building

11

placement, drainage, screening, and lighting. *Id.* §51A-4.803(f). Absent such an enumerated ground for denial, the director "shall approve the site plan with no conditions." *Id.* §51A-4.803(h). There is no public hearing, no neighbor notification and objection procedure triggering a supermajority vote, and no revocation power.

33.   The following table summarizes the City's treatment of land uses within the Church's NO(A) zone:

| Use in NO(A) Zoning District | DDC Treatment |
|---|---|
| The Church's religious private school | Prohibited absent SUP |
| Child care facility | Allowed by right |
| Adult care facility | Allowed by right |
| Library | Allowed by right |
| Art gallery | Allowed by right |
| Museum | Allowed by right |
| Private country club | Allowed by right |
| Public park | Allowed by right |
| Playground | Allowed by right |
| Public school | Allowed by right + RAR |

## CAUSES OF ACTION

### COUNT I
### Violation of the Equal Terms Provision of RLUIPA
### (42 U.S.C. §2000cc(b)(1))

34.   The foregoing allegations are incorporated by reference.

35.   RLUIPA "accord[s] religious exercise heightened protection from government-imposed burdens" in the specific context of "land-use regulation." *Cutter v. Wilkinson*, 125 S. Ct. 2113, 2117-18 (2005); *see also Barr v. City of Sinton*, 295 S.W.3d 287, 294-96 (Tex. 2009). The statute protects the "use of real property for the purpose of religious exercise." 42 U.S.C. §2000cc-5(7)(A)-(B). It is "construed in favor of a broad protection of religious exercise, to the maximum extent permitted[.]" *Id.* §2000cc-3(g).

12

36.  RLUIPA's Equal Terms Provision provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* §2000cc(b)(1). This provision "contemplates both facial and as-applied challenges." *New Harvest Christian Fellowship v. City of Salinas*, 29 F.4th 596, 604 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023); *accord Elijah Grp., Inc. v. City of Leon Valley, Tex.*, 643 F.3d 419, 422 (5th Cir. 2011). Under either theory, "it is a violation of the Equal Terms Clause … if a religious institution is treated less well than a similarly situated nonreligious comparator." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 291 (5th Cir. 2012).

37.  The Church, including its planned religious school, is "a religious assembly or institution" under RLUIPA. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 545 (S.D.N.Y. 2006) ("Numerous courts analyzing RLUIPA claims have found facilities used for religious education to fall under RLUIPA's protection."), *aff'd*, 504 F.3d 338 (2d Cir. 2007).

38.  The City of Dallas is a municipality and thus a "government" within the meaning of RLUIPA. *See* 42 U.S.C. §2000cc-5(4) (defining "government" to include "a State, county, municipality, or other government entity created under the authority of the State").

39.  The City's NO(A) zoning ordinance and its application to the Church are "land use regulation[s]" within the meaning of RLUIPA. *See id.* §2000cc-5(5) (defining "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land").

40.  The Development Code facially violates the Equal Terms Provision by permitting "public school[s]" to operate in the NO(A) zone by right while subjecting all "private school[s]" to an SUP requirement. Because government-run public schools are constitutionally prohibited from "compell[ing] attendance and participation in a religious exercise," *Kennedy*, 142 S. Ct. at 2431 (cleaned up), this statutory structure guarantees that every religious school that does so is "treat[ed] … on less than equal terms with a nonreligious [school]." 42 U.S.C. §2000cc(b)(1). Such an "express

distinction drawn by the ordinance between religious and non-religious institutions establishes a prima facie case for unequal treatment." *Opulent*, 697 F.3d at 293 (cleaned up).

41.   The facial violation extends beyond the public-vs.-private-school category. The Development Code draws further express distinctions between religious schools and numerous nonreligious assemblies and institutions within the same zone. Unlike a religious school, a "child or adult care facility," a "library, art gallery, or museum," a "country club with private membership," and a "public park, playground, or golf course" are all permitted by right in the NO(A) zone without any SUP requirement. DDC §§51A-4.204(3), (16); 51A-4.208(1), (3). Each of these is a nonreligious assembly or institution that the Code's text facially treats more favorably than religious schools. The "need for a SUP alone differentiates treatment of a church from a non-religious assembly allowed in [the same zoning district] as of right." *Christian Assembly Rios De Agua Viva v. City of Burbank*, 237 F. Supp. 3d 781, 793 (N.D. Ill. 2017); *see also Anchor Stone Christian Church v. City of Santa Ana*, 777 F. Supp. 3d 1126, 1142 (C.D. Cal. 2025) (holding SUP requirement for churches that did not apply to comparable secular uses drew an "express distinction" between religious and nonreligious assemblies).

42.   The Development Code also violates the Equal Terms Provision as applied to the Church. By classifying the Church's planned school as a "private school" requiring an SUP instead of a "church" permitted to operate by right, the City treated the Church on less than equal terms with public schools and other comparable secular assemblies that are permitted to operate in the same zone by right.

43.   The Fifth Circuit "requires that the religious institution in question be compared to a nonreligious counterpart, or 'comparator.'" *Opulent*, 697 F.3d at 291. Whether the religious institution is treated on "'less than equal terms' must be measured by the ordinance itself and the criteria by which it treats institutions differently." *Id.* at 292. This requires determining "(1) the regulatory purpose or zoning criterion behind the regulation at issue, as stated explicitly in the text of the ordinance or regulation; and (2) whether the religious assembly or institution is treated as well as every other nonreligious assembly or institution that is 'similarly situated' with respect to the stated

14

purpose or criterion." *Id.* at 292-93. "[T]he government must affirmatively satisfy this two-part test to bear its burden of persuasion" "once a religious plaintiff establishes a prima facie case of a violation." *Id.* at 291-93.

44.   The stated purpose of the Church's NO(A) zone is to provide uses "compatible with and … intended for location adjacent to single family, duplex, and townhouse neighborhoods" and to "preserve the environmental quality of neighborhood areas." DDC §51A-4.121(a)(1). The Development Code's general zoning purposes include ensuring "safe and efficient circulation of all modes of transportation," "secur[ing] safety from fire, flooding, and other dangers," and "prevent[ing] the overcrowding of land." *Id.* §51A-1.102(b)(1).

45.   The City's application of the Code's SUP requirement treats the Church's planned religious school on less than equal terms with numerous nonreligious assemblies and institutions similarly situated with respect to the zone's stated regulatory purposes:

    a.   A "**public school**"—a nonreligious institution serving a similar or greater student population with similar or greater infrastructure demands—is permitted by right subject only to RAR. *Id.* §51A-4.204(17)(B). This category is constitutionally and definitionally closed to religious institutions.

    b.   A "**child or adult care facility**"—a nonreligious institution generating similar peak-hour traffic from parental drop-off and pick-up and operating during comparable hours—is permitted by right. *Id.* §51A-4.204(3).

    c.   A "**library, art gallery, or museum**"—a nonreligious institution drawing public visitors, generating traffic, and requiring parking—is permitted by right. *Id.* §51A-4.204(16).

    d.   A "**country club with private membership**"—a nonreligious institution with potentially hundreds of members generating significant traffic, parking, and noise—is permitted by right. *Id.* §51A-4.208(1).

    e.   A "**public park, playground, or golf course**"—a nonreligious institution generating community-wide traffic and activity—is permitted by right. *Id.* §51A-4.208(3).

46. The Church is entitled to regulation under "the same standard that applies" to these comparable nonreligious assemblies. *Corp. of the Catholic Archbishop of Seattle v. City of Seattle*, 28 F. Supp. 3d 1163, 1170 (W.D. Wash. 2014).

47. The Church has suffered and will continue to suffer irreparable harm. *See Opulent*, 697 F.3d at 295-96 ("The infringement of one's rights under RLUIPA constitutes irreparable injury.") (cleaned up). "[I]njunctions protecting First Amendment freedoms are always in the public interest," including "injunctions protecting RLUIPA rights." *Id.* at 298. Beyond the infringement of its rights under RLUIPA and the First Amendment, the Church has been deprived of the use and development of real property it purchased for religious exercise, continues to incur holding costs and other expenses associated with the Property, and its ability to hire staff, obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees. *See id.* at 289-90, 298-99 & n.20.

## <u>COUNT II</u>
### Violation of the Substantial Burden Provision of RLUIPA
### (42 U.S.C. §2000cc(a)(1))

48. The foregoing allegations are incorporated by reference.

49. RLUIPA's Substantial Burden Provision provides that no government shall impose or implement a land-use regulation that "imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the government satisfies strict scrutiny—demonstrating that the burden "(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000cc(a)(1). This provision applies whenever a "substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." *Id.* §2000cc(a)(2)(C).

50.   The City's SUP process imposes such individualized assessments by evaluating each application on its merits, applying subjective criteria, and subjecting land use to discretionary approval. *See Castle Hills First Baptist Church v. City of Castle Hills*, 2004 WL 546792, at *15 (W.D. Tex. Mar. 17, 2004) ("Zoning, and the special use permit application process specifically, inherently depend upon a system of individualized assessment."). The City's application of that requirement—after inquiring about the Church's hours, grades, and primary educational purpose—was such an individualized assessment.

51.   A land use regulation—"even one of general applicability"—"imposes a substantial burden if it limits the use of real property that is otherwise available for the proposed exercise of religion so as to *prevent* the proposed exercise of religion on the property." *Anash, Inc. v. Borough of Kingston*, --- F.4th ----, 2026 WL 2196426, at *14 (3d Cir. July 30, 2026) (original emphasis). Where a municipality "ha[s] taken the position that there is no way to 'quickly or easily' allow the use of" property for religious exercise, it "limit[s] the use of real property in a way that prevents religious exercise on that property"—establishing a substantial burden and triggering strict scrutiny. *Id.* at *15.

52.   The City's SUP requirement imposes a substantial burden on the Church by preventing it from using its real property for the proposed exercise of religion. The City has taken the position that there is no quick or easy way for the Church's religious school to operate on the Property, determining instead that the school "would be classified as a private school which requires a specific use permit." The SUP process requires legislative action by City Council, public hearings, neighbor input and a potential neighbor veto, subjective findings, and carries the perpetual threat of amendment or revocation. Getting an application to City Council can potentially take eight to nine months; the process requires at least one year to complete and would cost the Church over $100,000 in application fees, professional studies, and legal expenses—with no assurance of approval or renewal even if approved. The City's implementation of the SUP requirement therefore "limits the use of real property in a way that prevents religious exercise on that property." *Anash*, 2026 WL 2196426, at *15.

53.   The City cannot demonstrate that its SUP requirement furthers a compelling government interest through the least restrictive means. The City already permits land use within the Church's zone for public schools, child and adult care facilities, country clubs, libraries, museums, and parks by right or with objective, nondiscretionary administrative review. If those processes protect the City's interests for such comparable secular uses, the SUP process is not the least restrictive means for the Church's religious school.

54.   Beyond the infringement of its rights under RLUIPA and the First Amendment, the Church continues to incur holding costs and other expenses associated with the Property, and its ability to obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees.

### COUNT III
**Violation of the Unreasonable Limitations Provision of RLUIPA
(42 U.S.C. §2000cc(b)(3)(B))**

55.   The foregoing allegations are incorporated by reference.

56.   RLUIPA's Unreasonable Limitations Provision provides that "[n]o government shall impose or implement a land use regulation that … unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. §2000cc(b)(3)(B).

57.   The Development Code unreasonably limits the ability of religious assemblies and institutions to conduct religious education within the City of Dallas. Even though the Development Code expressly permits the use of church-owned property in the Church's NO(A) zone for "religious training" and "other religious activities" by right, the City's interpretation requires a church that wishes to provide religious education as part of its mission to obtain an SUP—a burdensome, discretionary, intrusive, and uncertain process of boundless government scrutiny.

58.   The City's position that religious education does not qualify as "religious training" or a "religious activit[y]" within the meaning of the Development Code—despite the plain meaning of

those broad statutory terms and the longstanding connection between churches and education—imposes an unreasonable limitation on religious activity.

59.   The City's unreasonableness is compounded by its favored treatment of secular education. A secular public school may operate by right in the same zone, while a church-affiliated religious school performing similar educational functions with comparable or lesser zoning impacts must obtain SUP approval. This regulatory asymmetry renders the limitation unreasonable under RLUIPA.

60.   Beyond the infringement of its rights under RLUIPA and the First Amendment, the Church continues to incur holding costs and other expenses associated with the Property, and its ability to obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees.

**COUNT IV**
**Violation of the Free Exercise Clause of the First Amendment**
**(U.S. CONST. amend. I; 42 U.S.C. §1983)**

61.   The foregoing allegations are incorporated by reference.

62.   The Free Exercise Clause of the First Amendment, made applicable to the City through the Fourteenth Amendment, states that governments "shall make no law … prohibiting the free exercise" of "religion." U.S. CONST. amend. I. This Clause protects not only private belief but "the ability … to live out [one's] faith[] in daily life[.]" *Kennedy*, 142 S. Ct. at 2421.

63.   "Religious education" is a protected exercise of religion. *Our Lady*, 140 S. Ct. at 2064-65. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064.

64.   The City's SUP requirement "burden[s] [the Church's] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2421-22. "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Id.* at 2422.

19

Importantly, "targeting is not required for a government policy to violate the Free Exercise Clause." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*"). As the en banc Ninth Circuit recently summarized:

> Distilled, Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny. First, a purportedly neutral generally applicable policy may not have a mechanism for individualized exemptions. Second, the government may not treat comparable secular activity more favorably than religious exercise. Third, the government may not act in a manner hostile to religious beliefs or inconsistent with the Free Exercise Clause's bar on even subtle departures from neutrality. The failure to meet any one of these requirements subjects a government regulation to review under strict scrutiny.

*FCA*, 82 F.4th at 686 (cleaned up) (citing *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021), *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), and *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)).

65. The City's SUP requirement triggers strict scrutiny for at least four independent reasons. It is not neutral or generally applicable because it **[1]** "discriminates on its face" against "religious exercise"; **[2]** "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"; and **[3]** "provides a mechanism for individualized exemptions." *Kennedy*, 142 S. Ct. at 2422 (citing *Fulton*, 141 S. Ct. at 1877; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 113 S. Ct. 2217, 2233-34 (1993)). And strict scrutiny applies regardless of the SUP requirement's neutrality or general applicability because it **[4]** "substantially interfer[es] with the religious development" of children. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2361 (2025) (citing *Wisconsin v. Yoder*, 92 S. Ct. 1526, 1534 (1972)).

### *Facial Discrimination*

66. The Development Code facially discriminates against religious exercise by categorically excluding all religious schools from the favored treatment it affords nonreligious schools. The Code permits "public" schools to operate by right while requiring all "private" schools to obtain an SUP. Because government-run public schools are constitutionally incapable of "compell[ing] attendance

and participation in a religious exercise," *Kennedy*, 142 S. Ct. at 2431 (cleaned up), the Code's favored "public" school category is functionally closed to institutions like the Church's planned school that require attendance and participation in religious exercise throughout the curriculum. A regulatory scheme that channels all such religious schools into a disfavored category requiring discretionary legislative approval, while permitting their secular counterparts to operate by right, is not neutral with respect to religion.

### *Favored Secular Comparator*

67. The Development Code treats multiple comparable secular activities more favorably than the Church's religious school—including public schools, child care facilities, libraries, art galleries, museums, country clubs, public parks, playgrounds, and golf courses—all of which operate by right in the same zone despite generating comparable or greater zoning impacts.

68. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (original emphasis). It is irrelevant that the regulation "treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Id.*

### *Individualized Exemptions*

69. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). For example, a law that conditions religious exercise on a "standard [that] permit[s] the government to grant exemptions based on the circumstances underlying each application" is "not generally applicable." *Id.*

70. The SUP process is a textbook individualized assessment mechanism: "[e]ach SUP application must be evaluated as to its probable effect on the adjacent property and the community welfare and may be approved or denied as the findings indicate appropriate." DDC §51A-4.219(a)(2). The approval criteria are subjective, the conditions are discretionary, and the City may tailor each

approval to the circumstances of each individual applicant. "It is not only the conclusions that may be reached by the [City] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chicago*, 99 S. Ct. 1313, 1320 (1979).

71.   For church-affiliated education, the City Code creates another individualized-assessment mechanism that precedes the SUP process: the City must first determine whether a church's educational activities fall within "public worship, religious training, or other religious activities" permitted for a "church" by right, DDC §51A-4.204(4)(A), or instead constitute a "private school" requiring an SUP. That determination is no less case-by-case: City officials must delve into the specific facts and circumstances of a church's conduct to decide whether its educational ministry qualifies as religious activity or crosses an undefined line into formal schooling. The City did exactly that here, asking the Church about its planned school's hours, grades, primary educational purpose, and accreditation before concluding that an SUP would be required. This threshold inquiry vests officials with discretion to draw lines between favored and disfavored religious uses based on subjective judgments about how much education is too much and when religious training becomes private schooling—the hallmark of a system of individualized exemptions. *Fulton*, 141 S. Ct. at 1877.

### *Interference with Religious Development of Children*

72.   If a policy "substantially interfere[s] with the religious development" of children, "strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable." *Mahmoud*, 145 S. Ct. at 2361. The Development Code's SUP requirement independently triggers strict scrutiny because it substantially interferes with the religious upbringing of children.

73.   Trinity Bible Church belongs to a long line of "Protestant churches [that], from the earliest settlements in this country, viewed education as a religious obligation." *Our Lady*, 140 S. Ct. at 2065. "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064. The Church seeks to carry out exactly that mission. But the SUP requirement "pose[s] 'a very real threat of undermining'" that mission by conditioning it on neighbor approval and City Council

discretion, and by subjecting it to a perpetual threat of revocation. *Mahmoud*, 145 S. Ct. at 2355. By conditioning all religious education in the Church's zone on legislative approval, the City "interposes a serious barrier to the integration of … child[ren] into the [Church's] religious community." *Yoder*, 92 S. Ct. at 1531.

74.  Because the SUP requirement is not neutral or generally applicable and substantially interferes with the religious development of children, it is subject to strict scrutiny. The City cannot show its SUP requirement is narrowly tailored to a compelling interest through the least restrictive means. The City permits comparable secular uses by right or with objective and nondiscretionary administrative review; thus, the SUP process cannot be the least restrictive means for the Church's religious school.

75.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Beyond the infringement of its rights under RLUIPA and the First Amendment, the Church continues to incur holding costs and other expenses associated with the Property, and its ability to obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees.

**COUNT V**
**Violation of the Establishment Clause of the First Amendment**
**(U.S. CONST. amend. I; 42 U.S.C. §1983)**

76.  The foregoing allegations are incorporated by reference.

77.  The Establishment Clause of the First Amendment, made applicable to the City through the Fourteenth Amendment, restricts "law[s] respecting an establishment of religion." U.S. CONST. amend. I.

78.  The Establishment Clause prohibits governments from meddling in the internal affairs of churches. This "general principle of church autonomy" guarantees a church's "independence in matters of faith and doctrine and in closely linked matters," including "decisions that are essential to

the institution's central mission." *Our Lady*, 140 S. Ct. at 2060-61. Because "any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion," the First Amendment "outlaws such intrusion." *Id.* at 2060; *Carson v. Makin*, 142 S. Ct. 1987, 2001 (2022) ("[S]crutinizing whether and how a religious school pursues its educational mission … raise[s] serious concerns about state entanglement with religion[.]").

79.   The Development Code's definition of "Church"—permitting the use of property for "public worship, religious training, or other religious activities" by right—is broad enough to exempt the Church's religious education from the SUP requirement. Consistent with the canon of constitutional avoidance, this construction of the Development Code would avoid the constitutional violations described herein. *See NLRB*, 99 S. Ct. at 1318 (construing statute to avoid "intrusion into the administration of the affairs of church-operated schools" under principle that statutes "ought not to be construed to violate the Constitution if any other possible construction remains available"); *Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757, 767 (N.D. Tex. 2007) (laws are "given a construction consistent with constitutional requirements, when possible").

80.   As applied by the City, however, the Code requires elected officials to determine, on an individualized basis, whether a church's use of its property for religious education constitutes "religious training[] or other religious activities" (permitted by right) or a "private school" (requiring an SUP). As demonstrated by the City's application here, this entangles the City in scrutinizing whether the Church's religious education is or should be the primary source of educational training for students, its hours and grade levels, and its accreditation status—matters at the core of how the Church pursues its religious educational mission.

81.   Additionally, once the City classifies a church's religious education as a "private school," as it did here, the SUP process further entangles the City by requiring elected officials to scrutinize whether the church's religious education "complement[s] or [is] compatible with the surrounding uses" and "contribute[s] to, enhance[s], or promote[s] the general welfare of the area." DDC §51A-4.219(a)(3). Even if the SUP is granted, elected officials retain discretion to restrict the Church's

24

permission to provide religious education with time limits, conditions, or revocation. *Id.* §§51A-4.219(b)(6), (c)(13).

82. Absent a longstanding historical tradition of similar government entanglement with church-run religious education, the City's application of its SUP requirement to the Church is unconstitutional. *Kennedy*, 142 S. Ct. at  2426-30 ("[T]he Establishment Clause must be interpreted by reference to historical practices and understandings.") (cleaned up). No history or tradition justifies the City's intrusion into the how the Church accomplishes its educational mission.

83. Beyond the infringement of its rights under RLUIPA and the First Amendment, the Church continues to incur holding costs and other expenses associated with the Property, and its ability to obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees.

**COUNT VI**
**Violation of the Texas Religious Services Clause**
**(TEX. CONST. art. I, §6-a)**

84. The foregoing allegations are incorporated by reference.

85. Article I, Section 6-a of the Texas Constitution provides: "This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief."

86. This provision was enacted in 2023 to provide heightened protection for religious services beyond existing federal and state law. *See Perez v. City of San Antonio*, 715 S.W.3d 709, 721 (Tex. 2025). As construed by the Texas Supreme Court, the Clause not only "forbids [] unequal treatment of religious services," but "obviously does more." *Id.* at 725.

87. The Church is "a religious organization established to support and serve the propagation of a sincerely held religious belief."

88. The Church's use of its Property for religious education is a "religious service[] conducted in churches" because the Church's planned educational activities are religious in character are conducted by and through the Church on Property owned by the Church.

89. The City is "a political subdivision of this state."

90. The City's SUP requirement and application thereof to the Church constitutes an "enact[ment], adopt[ion], or issu[ance] [of] a statute, order, proclamation, decision, or rule that limits religious services" in violation of Article I, Section 6-a.

91. Beyond the infringement of its rights under the Texas Constitution, the Church continues to incur holding costs and other expenses associated with the Property, and its ability to obtain funding and develop the Property for use related to religious education is diminished without the certainty that such use will be protected. As a result of this violation, the Church is entitled to declaratory and injunctive relief, damages, and attorneys' fees.

## PRAYER FOR RELIEF

The Church respectfully requests that the Court:

(1) declare that the Development Code's SUP requirement for a private school, on its face and as applied by the City to the Church, violates RLUIPA's Equal Terms, Substantial Burden, and Unreasonable Limitations Provisions, 42 U.S.C. §2000cc;

(2) declare that the Development Code's SUP requirement for a private school, on its face and as applied by the City to the Church, violates the Free Exercise and Establishment Clauses of the First Amendment, U.S. CONST. amend. I;

(3) declare that the Development Code's SUP requirement for a private school, on its face and as applied by the City to the Church, violates the Religious Services Clause of the Texas Constitution, TEX. CONST. art. I, §6-a;

(4) declare that the Church is permitted to use its Property for religious education without an SUP as a matter of right under the Development Code, RLUIPA, the First Amendment, and/or the Texas Constitution;

26

(5)    issue a preliminary and permanent injunction prohibiting the City from imposing an SUP requirement on the Church regarding the use of its Property for religious education;

(6)    award compensatory and nominal damages against the City for RLUIPA violations;

(7)    award the Church reasonable attorneys' fees, costs, and expenses under 42 U.S.C. §1988(b) and TEX. CIV. PRAC. & REM. CODE §110.005(a); and

(8)    award all such other relief as the Court may deem proper.

## JURY DEMAND

The Church demands a trial by jury of all issues so triable.


Dated: August 5, 2026                                                            Respectfully submitted,


                                                                                 /s/ *Chase A. Cobern*

                                                                                 Chase A. Cobern
                                                                                 Texas Bar No. 24101633
                                                                                 ccobern@munckwilson.com
                                                                                 Michael A. McCabe
                                                                                 Texas Bar No. 24007628
                                                                                 mmccabe@munckwilson.com
                                                                                 Lucas R. Dombroski
                                                                                 Texas Bar No. 24142846
                                                                                 ldombroski@munckwilson.com
                                                                                 MUNCK WILSON MANDALA LLP
                                                                                 2000 McKinney Avenue, Suite 1900
                                                                                 Dallas, TX 75201
                                                                                 (972) 628-3600
                                                                                 (972) 628-3616 fax

                                                                                 *Counsel for Plaintiff*
                                                                                 *Trinity Bible Church of Dallas*

27